ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA | MAG. NO. 04-0289 BMK |
| v. | APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT |
| 2070 Kalakaua Street Room #1601 Honolulu, HI 96815 | |

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAR 29 2004

at ___ o'clock and ___ min. ___ M
WALTER A. Y. H. CHINN, CLERK

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

The undersigned person, after being duly sworn, deposes and says that there is reason to believe that:

On the premises/property described in the attached Affidavit and appended attachments (which is hereinafter collectively referred-to as "Affidavit" and incorporated herein by reference), in the District of Hawaii,

There is now concealed the property identified in the Affidavit, which is property that constitutes evidence of the commission of a criminal offense; contraband, the fruits of crime, or things otherwise criminally possessed; and property designed or intended for use or which is or has been used as the means of committing a criminal offense,

Concerning a violation of Title 21, United States Code, Sections 841(a)(1).

The facts to support a finding of Probable Cause are set forth in the attached Affidavit.

_____
AFFIANT'S NAME: WILLIAM C. WISE
AFFIANT'S POSITION: DEA Special Agent
ENFORCEMENT AGENCY:

Sworn to before me, and
subscribed in my presence:
March 25, 2004, at Honolulu, Hawaii.
**NAME & TITLE OF JUDICIAL OFFICER:**

_____
U.S. MAGISTRATE JUDGE
BARRY M. KURREN

## **AFFIDAVIT OF WILLIAM C. WISE**

WILLIAM C. WISE, after being duly sworn, deposes and states as follows:

1. I am currently a Special Agent with the Drug Enforcement Administration, (DEA), and I have been employed with the Drug Enforcement Administration for the past 4 years and 5 months. I have participated in investigations involving controlled substances offenses and in the debriefing of defendants, witnesses, informants and others who have knowledge of narcotics trafficking. I have also received specialized training concerning the activities of narcotics traffickers. I was previously employed as an Arlington County, Virginia Police Officer for approximately 5 ½ years. As a result of my training and experience, I am familiar with how various controlled substances are used and the typical distribution and trafficking patterns generally utilized by drug dealers and traffickers. As a result of my experience and training, I am familiar with the common practices utilized by drug traffickers to smuggle drugs through airports.

2. In a substantial number of residential searches executed in connection with the drug investigations in which my office and I have been involved, the following kinds of drug-related evidence have typically been recovered: (1) controlled substances; (2) paraphernalia for using, packaging, processing, weighing, and distributing controlled substances, for example: scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices; (3) books, records, receipts, notes, ledgers and other papers relating to the distribution of controlled substances; (4) personal books and papers reflecting names, addresses, telephone numbers, and other contact/identification data relating to the distribution of controlled substances; (5) Cash,

currency, and records relating to income and expenditures of money and wealth relating to controlled substances, as for example, money order, wire transfer and cashier's check receipts, bank statements, passbooks, checkbooks, and check registers. In addition, during the course of said residential searches, the agents have also found items of personal property which tend to identify the person(s) in residence, occupancy, control or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

3. Based upon my experience and training, as well as the corporate knowledge and experience of other agents and police officers in my office, I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia (as described above) in their residences. Furthermore, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (i.e., sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Additionally, telephone/address listings of clients and suppliers necessarily must be maintained and immediately available in order to efficiently conduct their drug trafficking business. Moreover, it is also a generally common practice for traffickers to conceal at

their residences large sums of money, either the proceeds from drug sales or to be utilized to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

    4. My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following: (a) my own involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described; (b) my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations; and (c) other intelligence information provided through law enforcement channels.

    5. Methamphetamine in crystallized or "rock" form (sometimes referred to in the drug slang as "crystal", "ice", "meth", "crystal meth", "crystals", "shabu" [Japanese slang term] or "batu" [Filipino slang term]) is ingested into the body by smoking in glass pipes (the crystals vaporize when subjected to intense heat from butane torches, lighters, and the like, and the vapors are then inhaled) and in recent times has become a very popular drug among abusers in Hawaii. Methamphetamine is not presently manufactured to a significant extent in the State of Hawaii. Source areas for

methamphetamine are generally located in the far east (clandestine labs producing the drug are believed to be located in South Korea, Taiwan, Japan and the Philippines, among other places), and also the west coast of the mainland (suspected labs being located in California, Oregon, and Washington). Consequently, it would be a common practice for methamphetamine traffickers in Hawaii to have the drug sent to them from the mainland and elsewhere via U.S. Postal Service parcel post/express mail or by way of private, small parcel service carriers and airline cargo/freight service. Similarly, it is also a common practice for said traffickers in Hawaii to send cash payments or other forms of remuneration back to their mainland and overseas drug sources via the same means. Such mail and small parcel service necessarily results in the generation of various air freight/cargo documents for said shipments, which typically are also kept in residences. Alternatively, such methamphetamine traffickers would have to themselves travel (or pay and arrange for others to travel on their behalf) to or from the State of Hawaii to acquire and import the drug here. Such travel necessarily results in the generation of various travel documents for the traveler, which typically are also kept in residences.

6. In a number of residential searches in prior drug investigations, the above-described drug trafficking records were found to be maintained electronically on computers and associated electronic storage media (a more specific description would be as follows: computers, external electronic storage media (such as external hard drives and computer disks) and other associated equipment and accessories necessary to examine and record data stored in said computers and storage media (such as

4

monitors, printers, external drives, and other peripherals)). In addition, the larger, small-package carriers such as Federal Express (FEDEX), United Parcel Service (UPS), and DHL maintain computer internet sites which provides customers with tracking information and the status of various shipments within the small package carrier's system (for example, when a customer enters the package's tracking number, the internet site will provide data such as when a given package was received at the origin, when it reached various intermediate hubs en-route, and when it arrived at the destination for delivery). In past drug trafficking investigations involving small package carrier shipments of drugs and drug proceeds (as cash), computers in the residences of suspected drug traffickers were being utilized to track said shipments, which can be ascertained by examining the computer's electronic memory.

7. I am also aware from my own experience and training that it is a very common practice for drug traffickers to maintain firearms and ammunition in their residences for the purpose of protecting their drug inventory and drug proceeds stored there, not only from law enforcement personnel but also other drug traffickers who may attempt to "rip" them off. Firearms and ammunition have been recovered in a large majority of residence searches in the drug investigations in which I have been involved.

8. In a number of residential searches in prior drug trafficking investigations, these enumerated types of evidence have typically been recovered from the main residence and in addition, from other structures and areas on the property being searched, as for example, other buildings, outbuildings, garages, yard areas, trash

5

containers, storage areas and containers used in connection with or within the curtilage of said premises and buildings.

9. As indicated earlier, drug traffickers need to maintain close at hand their drug trafficking records and telephone and address listings of clients and suppliers in order to efficiently conduct their drug trafficking business. In a number of prior drug investigations in which I have been involved, such drug trafficking records and telephone/address listings have also been recovered from the vehicles which the drug traffickers own and/or use for their transportation. This is because in many instances, the traffickers either use such vehicles to facilitate their drug trafficking operations, or the drug trafficking itself is conducted from said vehicles.

**FACTS ESTABLISHING PROBABLE CAUSE**

10. Since approximately January 2004, Drug Enforcement Administration Agents and Task Force Officers have been involved in an on-going investigation of the drug trafficking activities of Dan PIZARRO. On January 30, 2004, DEA conducted a controlled delivery of approximately 2 pounds of crystal methamphetamine. The Federal Express package was sent from Ontario, California and was received by a now established DEA Confidential Source (hereinafter CS-1). From the above-stated intercepted Federal Express package, recorded phone calls, cooperating source(s) information and surveillance, it is known that PIZARRO is a pound quantity supplier of crystal methamphetamine to Hawaii.

11. From January 2004 to the present CS-1 has provided information that Dan PIZARRO is a supplier of crystal methamphetamine ("ice") to local distributors in

Hawaii. During that time period, Special Agents and Task Force Officers from the DEA worked closely with CS-1 and have independently corroborated a substantial amount of information provided by CS-1. The DEA has not found any of the substantial amount of information provided by CS-1 to be incorrect, inaccurate, bolstered or untrue. CS-1's information has been corroborated through recorded telephone conversations, surveillance of PIZARRO and independent investigation. CS-1 has related PIZARRO has supplied CS-1 with pound quantities of crystal methamphetamine on multiple occasions and that PIZARRO either sends the drugs via mail from Corona, California or will have unknown persons courier the drugs into Hawaii.

12. On January 28, 2004, Ontario Police Department, California intercepted a suspicious parcel destined for Aiea, Hawaii. Detective Carcich of the Ontario Police Department subsequently obtained a state search warrant for the parcel. The search warrant resulted in the recovery and seizure of approximately 2 pounds of crystal methamphetamine. The substance was field-tested and resulted in a positive indication for amphetamine.

13. On January 30, 2004, at approximately 5:59 p.m., the controlled delivery was executed. CS-1 accepted the package and was subsequently arrested. Shortly after CS-1's arrest, CS-1 was advised of and waived his Miranda Rights. At that time, CS-1 advised law enforcement officers that his source of supply for crystal methamphetamine was Daniel LNU (known to be Dan PIZARRO) from California and that PIZARRO had sent CS-1 the parcel containing approximately 2 pounds of crystal methamphetamine that was intercepted on January 28, 2004 by the Ontario Police

Department. CS-1 additionally stated that CS-1 had received approximately two previous parcels containing pound quantities of crystal methamphetamine from PIZARRO.

14. On that same date, CS-1 placed a recorded call to PIZARRO at telephone number 909-515-4685. During the conversation, CS-1 advised PIZARRO that the package PIZARRO had sent to him was in CS-1's vehicle and that the vehicle was towed. CS-1 then told PIZARRO that CS-1 was attempting to retrieve the package. At that time, PIZARRO told CS-1 to do whatever necessary to retrieve the package and to sell the package as soon as possible. CS-1 also provided consent to search three cellular telephones that were recovered from CS-1. On February 4, 2004, the phones were searched. Between January 29 and January 31, 2004, CS-1's cellular phone records indicated two outgoing calls to 909-515-4685, two missed calls on January 30, 2004 from 909-367-8625 and two missed calls on January 31, 2004 from 909-454-0377. All of the above-stated telephone numbers were identified as being PIZARRO's phone numbers by CS-1.

15. In February 2004, a DEA Source of Information (hereinafter SOI-1) identified PIZARRO and provided information about his (PIZARRO's) drug trafficking activities. Between February 2004 and present, Special Agents from the DEA and FBI worked closely with SOI-1 and have independently corroborated a substantial amount of information provided by SOI-1. The DEA has not found any of the substantial amount of information provided by SOI-1 to be incorrect, inaccurate, bolstered or untrue SOI-1 related that SOI-1 has known PIZARRO for approximately two years and that

PIZARRO has supplied SOI-1 with pound quantities of crystal methamphetamine via parcels during that two year time period. SOI-1 stated that PIZARRO resides in the area of Corona, California. SOI-1 related that in the summer of 2003, SOI-1 brokered a 15 pound crystal methamphetamine transaction between PIZARRO and James DELA CUESTA. DELA CUESTA has since been indicted on federal drug trafficking charges. SOI-1 further related that SOI-1 introduced CS-1 to PIZARRO in late 2003. SOI-1 stated that after that introduction, PIZARRO sent packages to SOI-1 that were intended for CS-1 because CS-1 had customers willing to purchase the narcotics. SOI-1 stated that these packages contained one to two pound quantities of crystal methamphetamine. SOI-1 then related that PIZARRO and CS-1 began doing transaction with one another without SOI-1 being involved. SOI-1 provided PIZARRO's cellular telephone number as 909-367-8625 (See paragraph 14 relating to PIZARRO's phone number appearing on CS-1's phone records).

    16. On February 13, 2004, CS-1 made a recorded telephone call to PIZARRO at telephone number 909-972-3895. During the conversation, CS-1 and PIZARRO discussed the whereabouts of SOI-1. CS-1 later asked PIZARRO if they were going to have "anything" for the future. PIZARRO then told CS-1, "be careful next time. I can't afford it." PIZARRO later stated that the "boys in blue" are smart. CS-1 later stated that he had a friend that wanted to go to the "show" and that CS-1's friend would pay "24" for a "ticket." CS-1 related that CS-1 and PIZARRO frequently used the word "show" as a reference to methamphetamine and "ticket" as a reference to the price of the narcotics.

17. On February 19, 2004, CS-1 made a recorded phone call to PIZARRO at telephone number 909-972-3895. During the call, CS-1 inquired about PIZARRO sending CS-1 a new package. PIZARRO responded, "Nothing yet." CS-1 and PIZARRO then further discussed the safest way to get the package to Hawaii.

18. On February 23, 2004, CS-1 had a recorded conversation with PIZARRO. During the call, CS-1 asked, "Anything else?" PIZARRO responded, "I need more paperwork for the ticket. It's off season." The CS later asked, "When is the next delivery?" PIZARRO responded, "The third of next month. Would you like some?" CS-1 related that he would "like it." Your Affiant believes that during this conversation, PIZARRO related to CS-1 that he needed more money ("paperwork") for the narcotics ("ticket").

19. On March 1, 2004, CS-1 made a recorded call to PIZARRO at telephone number 909-972-3895. PIZARRO told CS-1 that he would call him back. Shortly thereafter, PIZARRO called CS-1. During the call, PIZARRO stated, "I'm here with my partner." PIZARRO then stated, "If we got some tickets over there, it's a sure thing right?" CS-1 responded, "Yeah." PIZARRO then stated, "I just want to reassure him." Your Affiant believes that during this conversation, PIZARRO related to CS-1 that he was with his source of supply and that they wanted to know if they sent narcotics ("tickets") to Hawaii that CS-1 would be able to sell it.

20. On March 21, 2004, CS-1 received a phone call from PIZARRO from a blocked number. The call was recorded. During the call, CS-1 asked, "What happen to the sure thing?" PIZARRO stated, "He's still worried." The CS then related that "everybody

10

hungry here." PIZARRO later stated, "Once they're indicted. If I was involved I'd be on vacation already." Your Affiant believes that during this conversation, PIZARRO related that his source of supply was still worried and that is the reason they have not sent another package of methamphetamine. PIZARRO then related that if law enforcement believed he was involved that he would have been arrested ("on vacation") by now.

21. On March 24, 2004, CS-1 received a call from PIZARRO and asked CS-1 to pick him up from the Honolulu airport at approximately 11:50 p.m. that day. PIZARRO related that he was on a Delta flight. PIZARRO further asked CS-1 to "set-up a drop." Your Affiant believes that "set up a drop" is a reference to setting up a location that a parcel containing narcotics could be sent to. Law Enforcement Officers subsequently checked the flight manifest for Delta Flight 341. The flight originated from Los Angeles and was scheduled to arrive at approximately 11:50 p.m. on March 24, 2004.

22. On March 24, 2004, CS-1 met with Agents and Task Force Officers of the DEA at a pre-arranged location. CS-1 was searched and provided with a recording device. On March 24, 2004, at approximately 11:30 p.m., surveillance was established inside the Honolulu Airport. At approximately 11:50 p.m., Delta Flight 341 arrived. At that time, surveillance units observed PIZARRO and an unknown female exit the aircraft and enter the terminal. PIZARRO and the unknown female subsequently obtained their luggage and stood outside of the airport terminal in the arrival area.

23. On March 25, 2004, at approximately 12:15 a.m., CS-1 drove to and met PIZARRO and the unknown female at the airport terminal arrival area. Surveillance was maintained on the vehicle. CS-1 later drove PIZARRO and the unknown female to

11

the Gateway Hotel located at 2070 Kalakaua Street Honolulu, HI. Surveillance observed CS-1, PIZARRO and the female enter the hotel lobby. At that time, CS-1 obtained a room (Room #1601) for PIZARRO and the unknown female. The room was obtained in CS-1's name. All three subjects then went to room #1601. While inside the hotel room, CS-1 stated, "I'll talk to them tomorrow. When do you want it ready by?" PIZARRO then asked, "Did you make sure everything was cool? I don't want it to be a set-up." The CS-1 then told PIZARRO that it was not a set-up. CS-1 then stated, "I need this so you can pay me back." PIZARRO responded, "I need you to take care of what I need you to take care of." CS-1 then stated, "You got to take care of me before you take care of anyone else."

24. CS-1 later asked, "What time frame should I tell my friend? Are you ready now?" PIZARRO responded, "Yeah even tonight." CS-1 then stated that he was not going to do anything tonight. PIZARRO then asked, "Why not?" PIZARRO later related that he liked to do things on the spur of the moment so that things were not being recorded.

25. CS-1 and PIZARRO then discussed CS-1's arrest on January 30, 2004. During the conversation, CS-1 stated, "I couldn't believe it dude, you sent me that shit without wrapping it." PIZARRO stated, "I did wrap it." The CS told PIZARRO, "No you didn't." PIZARRO then stated, "I did, I'm dead serious." CS-1 stated, "It was two bags." PIZARRA asked, "When?" CS-1 then stated, "The one before the one that got picked up. It was in the massager, that was it." PIZARRO then related that someone else wrapped that one and that he normally uses saran wrap and coffee. Your Affiant

12

belives that based upon the above-stated conversation, PIZARRO indicated that he was the source of the two pounds of crystal methamphetamine that was intercepted on January 28, 2004.

## CONCLUSIONS

26. In summary, Agents of the Drug Enforcement Administration have been investigating and have obtained a substantial amount of information regarding the drug trafficking activities of Dan PIZARRO and his associates. This investigation has revealed through extensive and verified confidential source information, law enforcement surveillance, arrests of associated traffickers and intercepted parcels containing narcotics that PIZARRO has been for sometime and is still involved in the trafficking in significant amounts of crystal methamphetamine. Your Affiant believes that PIZARRO has supplied crystal methamphetamine to CS-1, SOI-1 and others for some time. Your Affiant further believes that PIZARRO is currently in possession of crystal methamphetamine and that he intends to deliver the crystal methamphetamine to CS-1 for delivery to CS-1's customer. Your Affiant's experience and the collective experience of other narcotics investigators involved in this investigation, your Affiant knows that narcotics traffickers involved in the long term, ongoing business of distributing crystal methamphetamine and other controlled substances must maintain records including pay/owe sheets, ledgers, or other forms of accounting methods, and phone or contact lists of customers in their vehicles, homes or other associated addresses including hotel rooms in which they reside or work. In addition, based on your Affiant's experience and the collective experience of other narcotics investigators

involved in this investigation, your Affiant knows that narcotics traffickers involved in the long term, ongoing business of distributing crystal methamphetamine and other controlled substances must maintain the tools of their trade to include narcotics, currency, packaging material, scales and other drug paraphernalia in their vehicles, homes or other associated addresses, including hotel rooms, in which they reside of work. Your Affiant is also aware that the Courts have recognized that drug dealers keep evidence relating to their crimes where they live (See, United States v. Dubrofsky, 581 F.2d 208, 213 (9th Cir. 978) and that probable cause for a search warrant can be based on an agent's "expert opinion that individuals who traffic in large quantities of illicit drugs generally keep records, proceeds from drug transactions, and other evidence in their homes.....") (See United States v. Hernandez-Escarsega, 886 F.2d 1560, 1566, (9th Cir. 1989).

27. WHEREFORE, based upon the foregoing, I believe that there is probable cause to believe that the following articles will be found at the subject premises 2070 Kalakaua Street Honolulu, HI 96815:

A. Controlled substances, to wit, methamphetamine, held in violation of 21 U.S.C. 841(a)(1).

B. Paraphernalia for using, packaging, processing, weighing, and distributing controlled substances, to wit: scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, heat-sealing devices, pipes, butane torches, lighters, and the like.

C. Books, records, receipts, notes, ledgers and other papers relating to the distribution of controlled substances.

D. Personal books and papers reflecting names, addresses, telephone numbers, and other contact/identification data relating to the distribution of controlled substances.

E. Cash, currency, and records relating to income and expenditures of money and wealth from controlled substances, to wit, money order, wire transfer and cashier's check receipts, and bank statements, passbooks, checkbooks, and check registers.

F. Items of personal property which tend to identify the person(s) in residence, occupancy, control or ownership of the premises that is the subject of this warrant, including but not limited to cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

G. Airline tickets, notes and itineraries, airline schedules, bills, charge card receipts, hotel/motel/rent-a-car statements, correspondence with travel agencies and other travel-related businesses, airline/rent-a-car/hotel frequent flier/user cards and statements, passports and other papers relating to domestic/international travel.

H. Waybills, airbills, bills of lading, receipts, delivery notices, other shipping documentation and packaging materials from the U.S. Postal Service, small package carriers, or common carriers which indicate the shipment of packages and parcels to and from Hawaii.

I. Computers, external electronic storage media (such as external hard drives and computer disks) and other associated equipment and accessories necessary to examine and record data stored in said computers and storage media (such as monitors, printers, external drives, and other peripherals).

J. Firearms and ammunition.

FURTHER AFFIANT SAYETH NAUGHT.

_____
WILLIAM C. WISE

Subscribed and sworn to
Before Me, this 25th Day of
March 2004.

_____
BARRY M. KURREN
U.S. MAGISTRATE JUDGE